**Richmond.**

CITY OF RICHMOND AND ANOTHER V. SMITH.

January 29, 1903.

1. RICHMOND CARNIVAL ASSOCIATION—*Right to Obstruct Streets—Charter Powers.*—The Circuit Court of the city of Richmond has no power to grant a charter to a corporation authorizing it to obstruct a public highway, and the charter granted to the Richmond Carnival Association does not purport to confer such power.

2. PUBLIC HIGHWAYS—*Control Over—Obstructions—Streets—Power of City.*—Public highways, whether in the country or in a city, belong completely and entirely to the public at large, and the supreme control over them is vested in the Legislature. A city, in the absence of legislative authority, has no power to authorize its streets to be obstructed by the erection of structures therein which unnecessarily impede or incommode the public in the lawful use of the streets.

3. STREETS—*Obstructions—Nuisance per se.*—An obstruction in a street need not be permanent in order to constitute it a nuisance. A platform sixty-four feet long, twelve feet wide, and six feet high, erected in a street, with liberty to maintain and use the same for a period of twelve consecutive days, and to which large crowds are daily attracted, is *per se* a nuisance.

4. MUNICIPAL CORPORATIONS—*Streets—Nuisance—Liability of City—Ultra Vires Acts.*—If a city, without legislative authority, authorizes the erection of a nuisance in one of its streets, it is liable in damages for the injuries resulting therefrom. The city cannot escape liability merely because it exceeded its powers in authorizing the nuisance.

Error to a judgment of the Law and Equity Court of the city of Richmond, rendered December 2, 1901, in an action of trespass on the case, wherein the defendant in error was the plaintiff, and the plaintiffs in error were the defendants.

*Affirmed.*

This action was brought by the defendant in error against the city of Richmond and the Richmond Carnival Association to recover damages for an injury inflicted on him by the falling of a structure erected by the Carnival Association in one of the principal streets of the city of Richmond. The facts in connection with the injury are thus stated in the petition for the writ of error:

"There is a conflict of testimony as to how he was injured. The plaintiff testified that he lived on west Cary street (south of Broad and west of this stand); that he was on the way to a store on the south side of Broad street, east of this stand, that he was on the north side of Broad street, walking east, and had just arrived at a point opposite the stand when the railing broke and struck him; that he did not see the 'cake-walk'; that he was paying no attention to it; and that he was not on the stand.

"John S. Harwood, a witness for the defendants, the vice-president of the Richmond Carnival Association, testified that he had put the crowd down from the railing; that the crowd on the side next the sidewalk was composed chiefly of negroes, and that he had noticed a white boy among them, and had twice spoken to that boy, warning him of his danger and making him get down; that the boy whom he made get down was the boy who was afterwards hurt when the stand fell, and who was taken into the bar-room. No other boy was taken from the pavement into the bar-room.

"Under this state of facts, the plaintiff sued the city of Richmond and the Richmond Carnival Association in an action of trespass on the case. The jury rendered a verdict for the plaintiff for $500, and judgment was duly entered."

The other facts sufficiently appear in the opinion of the court.

*Henry R. Pollard, Murray M. McGuire,* and *H. C. Riely,* for the plaintiffs in error.

*Wise & Watkins* and *Wyndham R. Meredith,* for the defendant in error.

HARRISON, J., delivered the opinion of the court.

The record shows that, in the year 1900, the Richmond Carnival Association obtained a charter of incorporation from the Circuit Court of the city of Richmond authorizing it to create, maintain, and conduct in the city of Richmond, and county of Henrico, such exhibitions and displays of the manufactures, resources and industrial enterprises of the city of Richmond, or such other cities, counties, and States, as may tend to advance the welfare of such cities, counties, or States so exhibiting, by affording a temporary or permanent collection and exposition of the various industries, resources, mercantile and business opportunities of the localities represented for the encouragement of investment, by home or foreign capital, in existing or new enterprises. And in furtherance of this object to hold or give such free or paid performances, spectacles, entertainments, or parades, as may to said corporation seem proper and advisable.

The association applied to the Council of the city of Richmond for permission to use the streets, and to erect certain structures thereon, with a view to holding a street fair or carnival from May 14 to 19, 1900, inclusive. The permission was granted by an ordinance approved April 5, 1900, authorizing, "so far as the city could grant such authority," the association to erect, and maintain, in and along the streets named, wooden or canvas booths or other structures, and, with the consent of the Committee on Streets, to suspend the use of the roadbed of the streets used, or certain parts thereof, as a highway for horses or vehicles during the period prescribed, and for three week-days prior thereto, and for three week-days thereafter. It being further provided by the ordinance that the association might lease or rent to persons, firms, or corporations the booths or other structures, for such compensation as to it may seem

just, and that the association or its lessees might sell wares, goods, or merchandise, or exhibit shows or performances without being liable to any tax therefor.

It further appears that among the structures erected by the association was one between Third and Fourth streets, on the north side of Broad street, sixty-four feet long, twelve feet wide, and six feet high, extending a distance equal to its width, from the curb line into the street, with a three-foot railing around the outside.

The petition for a writ of error states that there were immense crowds of people on Broad street, and that to entertain the crowd, numerous free shows were given, and among such performances a "cake-walk" was in progress on the large platform mentioned, on the night of May 19, 1900. That for the purpose of the show, the stand was cleared, so that there were on the platform nine performers, a band of five or six musicians, some officers of the Carnival Association, and several special policemen; that the officers of the association and the policemen were there chiefly to keep the crowd from standing on the platform, and thus obstructing the view, and that they made many efforts to do so, in which they were partially successful; that in spite of these efforts, however, when the band struck up and the performance actually commenced, many people clambered on the outside of the stand, holding on by the railing; that the railing on the side next the sidewalk was thus pulled off; that the sidewalk was tightly packed with people, and after the crowd was cleared away the plaintiff, Robert Lee Smith, a boy between twelve and thirteen years of age, was found on the pavement with his left leg broken and bruised on his hip and arms.

To recover damages for the injury thus received this actio. was brought by the infant plaintiff, suing by his next friend, against the city of Richmond and the Richmond Carnival Association. The result of the trial in the lower court was a judg-

ment in favor of the plaintiff for $500, the Carnival Association being designated as primarily liable, as provided by statute. Acts 1899-1900, pp. 288-9.    This judgment we are asked to review and reverse.

The Circuit Court did not, as contended, have the power to grant a charter authorizing the beneficiaries thereunder to obstruct the public highway, and in the charter of the Richmond Carnival Association no such authority is found.    The material part of the charter has been already set forth, and the language employed does not expressly or by implication authorize the obstruction of the streets of Richmond with the structure complained of in the case at bar.

The ordinance of the city authorizing the erection of the structure in question is relied on to defeat the claim of the plaintiff.    The city had no power or authority, in the absence of a grant from the General Assembly, to confer upon the Carnival Association the right to erect this structure in the public streets.    No such authority is found in its charter, or the general law.    On the contrary, the charter only gives the city authority to remove structures, obstructions, and impediments from the streets, and to prevent them from being encumbered or obstructed.    The power and authority of the city is contained in its charter, and bounded thereby.    It has no other or different control of the streets than is prescribed in the charter or the general statutes of the State.    Having no legislative authority to grant the use of the streets for such purpose, the ordinance was a nullity, and in no way affects the plaintiff's right to recover in this case.    Elliott on Roads and Streets (2d ed.), sec. 653; *Norfolk City* v. *Chamberlaine*, 29 Gratt. 534; *Norfolk Railway & Light Co.* v. *Consolidated Turnpike Co.*, 100 Va. 243, 40 S. E. 897; *Stanley* v. *City of Davenport*, 54 Iowa 463, 2 N. W. 1064, 6 N. W. 706, 37 Am. Rep. 216.

The contention of the plaintiff is that this large wooden structure, erected by the Richmond Carnival Association in a public

street of the city, with the knowledge and permission of the city of Richmond, was a nuisance *per se*, and that, the plaintiff having suffered damage in consequence of its erection, the defendants are liable. This question is raised alike by the demurrer to the declaration, and by the instructions, and is the crucial question in the case.

It is well settled that public highways, whether they be in the country or in a city, belong, not partially, but entirely, to the public at large, and that the supreme control over them is in the Legislature. It is also an established general rule that any unauthorized obstruction which unnecessarily impedes or incommodes the lawful use of a highway is a public nuisance at common law. 1 Wood on Nuisances, secs. 248-250; Elliott on Streets and Roads (2d ed.), sec. 645; *Dimmett* v. *Eskridge*, 6 Munf. 311; *Yates* v. *Town of Warrenton*, 84 Va. 337; *People* v. *Vanderbilt*, 28 N. Y. 396. The general rule mentioned is subject to a class of exceptions which result from the necessities of trade or business, such as placing building materials in the street for immediate use in the erection of a building; or a merchant placing goods in the street to be removed to his store; or a coach or omnibus stopping in the street to take up or set down passengers, and in many other ways; but even such privileges as these, born of necessity, must be exercised without unreasonable or unnecessary delay in removing such temporary obstructions. A reasonable time in which to remove such temporary obstructions being such time as is required in the ordinary course of business for their removal. Wood on Nuisances, secs. 256-257.

In Wood on Nuisances it is said: "Any unreasonable obstruction of a highway is a public nuisance, and indictable and punishable as such. As to precisely what the extent of the obstruction must be, in order to create a nuisance, is not definitely settled by the cases. But it would seem that, strictly speaking, any encroachment upon any part of a highway, whether upon the travelled part thereof or on the sides, comes clearly within

the idea of a nuisance. . . . The public is entitled to the full and free use of all the territory embraced within a highway in its full length and breadth, not only for the purpose of public travel, but also for all the purposes legitimately incident thereto, . . . and it is no defence that the encroachment is really for the benefit of the public." 1 Wood on Nuisances, sec. 250.

In Elliott on Roads and Streets, it is said that, "Public highways belong, from side to side and end to end, to the public, and any permanent structure or purpresture which materially encroaches upon a public street and impedes travel is a nuisance *per se*, and may be abated, notwithstanding space is left for the passage of the public. This is the only safe rule, for, if one person can permanently use a highway for his own private purposes, so may all, and if it were left to the jury to determine in every case how far such an obstruction might encroach upon the way without being a nuisance there would be no certainty in the law, and what was at first a matter of small consequence would soon become a burden not only to adjoining owners, but to all the taxpayers and the travelling public as well. Thus, expediency forbids any other rule. But even if it did not, the rule is well founded in principle, for it is well settled that the public are entitled, not only to a free passage along the highway, but to a free passage along any portion of it not in the actual use of some other traveller, and if this be true it necessarily follows that there can be no rightful permanent use of the way for private purposes." Elliott on Roads and Streets (2d ed.), sec. 645.

The numerous decisions cited by these learned authors show that the doctrine they announce has its foundation in the common law and prevails in England, and generally in the United States. It is insisted by the plaintiffs in error that the structure erected on Broad street was a temporary obstruction; that, not being permanent, it could not be regarded as a nuisance *per se*.

The word permanent does not always embrace the idea of absolute perpetuity, or lasting forever. An examination of the authorities shows that the ordinary acceptation of the word is far from being enforced in declaring a nuisance to be permanent. It is permanent in contradistinction to that class of nuisances, already mentioned, which are regarded as temporary, and made necessary by the exigencies of business.

An enormous structure, sitxy-four feet long, twelve feet wide, and six feet high, although not erected for an indefinite period, would seem to be sufficiently permanent in its nature to be a nuisance *per se* in contemplation of the general rule governing such cases, and we can find no warrant in the law for treating it as belonging to that class of temporary obstructions made necessary by the necessities of business. It is, however, not necessary that an obstruction should be permanent in order to be a nuisance. "An obstruction may be a nuisance although not of a permanent character. Any unauthorized use of a public highway so extensive or so long continued as to be unreasonable may amount to a nuisance." Elliott on Roads and Streets (2d ed.), 648; *Cohen* v. *Mayor of New York*, 113 N. Y. 532, 21 N. E. 700, 4 L. R. A. 406, 10 Am. St. Rep. 506; *Callanan* v. *Gilman*, 107 N. Y. 360, 14 N. E. 264, 1 Am. St. Rep. 831; *Smith* v. *McDowell*, 148 Ill. 51, 35 N. E. 141, 22 L. R. A. 393; *Osage City* v. *Larkin*, 40 Kan. 206, 19 Pac. 658, 2 L. R. A. 56, 10 Am. St. Rep. 186; *Little's Admr.* v. *City of Madison*, 42 Wis. 643, 24 Am. Rep. 435; *Bennett* v. *Fifield*, 13 R. I. 139, 43 Am. Rep. 17.

In the case of *Cohen* v. *Mayor of New York*, *supra*, which involved the right of a grocer to keep his grocery wagon standing day and night in front of his store when not in use, under a permit from the city to do so, and for which privilege an annual license fee was paid, the court said, that the permit of the City Council conferred no right upon the party who obtained it; that the storing of the wagon in the highway was a nuisance;

and that the city was liable to the plaintiff for the death of his intestate caused by the accident which resulted from the presence of the wagon in the street.

In the case of *Callanan* v. *Gilman, supra,* skids planked over, so as to make a walkway across the pavement, to enable a merchant to remove goods to and from the street in New York, were allowed to remain in position when in use from one to two hours at a time, to the inconvenience of the public, who had to walk around the obstruction. The court held that although in some sense a business necessity, still that such an extensive and continuous use of the sidewalk could not be justified; that there was no rule of law that would warrant such an obstruction daily for hours, or for one hour continuously; that the defendant was, therefore, guilty of a public nuisance.

In *Little* v. *City of Madison, supra,* the city licensed an exhibition of two large bears,whereby one of its principal streets became obstructed. The horses of a person travelling became frightened, and caused damage. The court held that there was no doubt as to the liability of the city for the injury, both on the ground that it failed to perform its legal duty of keeping the street free from dangerous obstructions and nuisances, and upon the further ground that the exhibition was permitted by the city.

In the case of *Bennett* v. *Fifield, supra,* three flat cars loaded with immense iron castings were left in the highway of a town temporarily, and a horse became frightened, causing damage. The town having reasonable notice of the presence of these cars in the streets, was held liable for the injury.

These cases and many others that might be cited not only illustrate the proposition that an obstruction need not be permanent in order to be a nuisance, but they also illustrate the general rule that any unauthorized obstruction which unnecessarily impedes or incommodes the lawful use of a highway is a public nuisance.

After a careful consideration of the authorities bearing upon this question, as already stated, we find no warrant in the law for holding the obstruction in the case at bar to be an exception to the general rule. On the contrary, such an obstruction, maintained in a public street for twelve consecutive days, and used for exhibitions calculated to attract large crowds of thoughtless and indiscreet persons, would seem to be condemned; by the spirit as well as the letter of the law established in such cases. The supreme control of streets is in the General Assembly. Cities have no power, without legislative authority, to authorize obstructions, in the streets, that are condemned as nuisances. If, under the inspiration of modern ideas, it is deemed necessary to the public weal that the streets of cities should be blocked by such obstructions and exhibitions as we are considering, the way is open to accomplish it. Let the Legislature be applied to for the requisite authority. The courts cannot grant it, nor can they approve the assumption of such a power, where no lawful authority for its exercise is shown to exist.

It is suggested that the city of Richmond, being without authority to grant the permit, its act was *ultra vires*, and it cannot be held liable. So far as we have examined the authorities, some of which are already cited, they hold this proposition to be unsound. It was the duty of the city to abate the nuisance and keep its streets free from obstruction. Its failure to do this makes it liable. The sin of commission in granting the permit cannot be less than the sin of omission in failing to discharge its duty.

For these reasons we are of opinion that there is no error in the rulings and judgment of the court below, and it must, therefore, be affirmed.

*Affirmed.*